**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

STEPHEN L. ATTERBURY,

                    Plaintiff,                        12-CV-00502-A(F)

        v.                                    **Decision and Order**

UNITED STATES MARSHALL SERVICE;
GARY INSLEY, Contracting Officer, Office
of Security Contracts, Judicial Security
Division, United States Marshall Service, in
his individual capacity; and
JOHN DOE, in his individual capacity,

                    Defendants.
_____

      The Plaintiff, Stephen Atterbury, was a Court Security Officer (CSO) at the

United States Courthouse in Rochester, New York and is challenging the U.S.

Marshall Service's (USMS) decision removing him from CSO duty after he

allegedly left his post.  The Plaintiff is an employee of Akal Security, Inc. (Akal), a

company with which the USMS contracts to provide security services in the

Second Circuit.  The Plaintiff claims that in ordering him removed from CSO duty,

the USMS denied him due process and acted arbitrarily and capriciously.

      The Court referred the case to Magistrate Judge Leslie G. Foschio

pursuant to 28 U.S.C. § 636(b)(1).  The Defendants filed a motion to dismiss the

complaint under Rule 12(b)(6) or, in the alternative, a motion for summary

judgment under Rule 56.  The Plaintiff responded and also filed a cross-motion

under Rule 56(d) requesting that consideration of the USMS's summary

judgment motion be deferred until additional discovery could be conducted.

Magistrate Judge Foschio issued a Report and Recommendation that

recommends granting the USMS' motion to dismiss and denying the Plaintiff's

Rule 56(d) motion.

Pursuant to 28 U.S.C. § 636(b)(1), the Court must make a de novo review

of those portions of the R&R to which objections have been made.  Upon a de

novo review of the R&R, and after reviewing the submissions and hearing

argument from the parties, the Court adopts Magistrate Judge Foschio's

recommendation that the Defendants' motion to dismiss be granted and that the

Plaintiff's Rule 56(d) motion be denied.

**Background**

A.   ***The U.S. Marshall Service's Contract with Akal***

The USMS contracts with Akal to provide security services at the federal

courthouses in the Second Circuit.  Dkt. No. 23 ¶ 6.  Akal, in turn, employs

individuals to serve as CSOs under the terms of the USMS-Akal contract.

Among those terms is a provision that "[a]ll CSOs . . . shall comply" with a

number of CSO "performance standards," including, as is relevant to this case,

the requirement that CSOs "[n]ot close or desert any post prior to scheduled

closure unless directed to do so by the supervisor.  [CSOs are to] [r]emain at

[their] assigned post until properly relieved or until the time post is to be secured."

USMS-Akal Contract § C-12(b)(31), Dkt No. 23-1 at 11.

Several other provisions of the USMS-Akal contract are relevant to this case.  First, the contract provides that the USMS "reserves the right at all times to determine the suitability of any [Akal] employee to serve as a CSO" and that "[a]ny decision to continue a[n] [Akal] employee in a CSO capacity will be made *solely* by the [USMS] Office of Court Security on a case-by-case basis."  *Id.* § H-3(b), Dkt. 23-1 at 14 (emphasis added).  Second, "any employee provided by [Akal] that engages in actions . . . or any activity that affects the integrity of the judicial process or is likely to compromise the security of the courts, shall be removed from performing services for the Government under th[e] contract, and shall not be reassigned to th[e] contract without the concurrence of the Contracting Officer."  *Id.* § H-3(e), Dkt. 23-1 at 15.  Finally, the contract provides that if the USMS determines that an Akal employee should be removed from CSO duty, both Akal and the employee are entitled to provide a written response addressing the removal within fifteen days of the Contracting Officer's initial removal notice.  *Id.* § H-3(e), Dkt. 23-1 at 15.  However, "[t]he Contracting Officer and Office of Court Security shall make the final determination of [Akal employee] suitability."  *Id.* § H-3(c), Dkt. 23-1 at 14.

**B.**     ***The Events Leading to the Plaintiff's Removal from the USMS-Akal Contract***

After retiring from a twenty-four year career as a U.S. Postal Inspector, in 2002 the Plaintiff was hired by Akal to work as a CSO in the Kenneth B. Keating Federal Building in Rochester, New York, which houses, among other things, the

Rochester Division of the U.S. District Court for the Western District of New York. Dkt. No. 29-2 ¶¶ 2, 4.  The Plaintiff acknowledges that "[b]efore the USMS approved [the Plaintiff] to work in the court I was presented with [the USMS's] performance standards and reviewed them.  I then signed an acknowledgement of the same."  *Id.* at ¶ 5.  By all accounts, the Plaintiff's service as a CSO was not questioned until the events giving rise to this litigation.

On February 24, 2011, the Plaintiff was assigned to "a special post."  *Id.* ¶ 11.  Congresswoman Louise Slaughter, whose office is also located in the Keating Building, was scheduled to hold a constituent meeting in the building's basement, and the Plaintiff was assigned to provide security for the meeting.  *Id.* The Plaintiff states that he felt progressively ill on February 24 and "would have left earlier, except I was specifically assigned to this post on account of the meeting."  *Id.*  "Shortly before" 1:30 p.m., approximately half-an-hour after the meeting was to have started, another CSO approached the Plaintiff outside the meeting room and told the Plaintiff that the meeting had been cancelled.  *Id.* ¶ 12.  An announcement of the cancellation had apparently been made over the radio earlier in the day.  *Id.*

Accounts of the events that followed on February 24 are disputed, but the disputes are not relevant to the Court's disposition of this case.  Because the case is before the Court on the Defendants' motion to dismiss, the Court views the facts in the light most favorable to the Plaintiff.  After learning that the

meeting with Congresswoman Slaughter had been cancelled, the Plaintiff

informed the Acting Lead CSO in the Keating Building that he was not feeling

well, would be going home, and likely would not be at work the following day.  *Id.*

¶ 12.  The Acting Lead CSO "approved [the Plaintiff's] early departure, saying

'See ya'" to the Plaintiff.  *Id.*  The Plaintiff claims that he "was not upset when [he]

left work on February 24," but he acknowledges that "[he] was sick and may well

have appeared out of sorts to others."  *Id.* ¶ 13.  The Plaintiff then secured his

weapon, changed out of his uniform, and left the Keating Building at

approximately 1:35 p.m.  *Id.* ¶ 15.

### C.   *Akal's Investigation of the Plaintiff's Conduct and the USMS's Responses*

Several days later, Gary Insley—the named defendant in this case, and

the USMS Contracting Officer assigned to the USMS-Akal contract—acting

pursuant to the USMS-Akal contract, requested that Akal investigate whether the

Plaintiff's actions on February 24 had violated CSO Performance Standard 31.

Dkt. No. 23 at ¶ 7.  (As noted above, Performance Standard 31 provides that

CSOs shall not leave their assigned post until they are relieved or are directed to

do so by a supervisor.)  Akal sent its contract manager, a retired New York City

Police lieutenant, to Rochester to investigate.  *Id.* ¶ 8; Dkt. No. 42 at 6.  Akal's

contract manager produced a four-page report that concluded that the Plaintiff

had not violated CSO Performance Standard 31 because "[t]he special post to

which [the Plaintiff] was assigned was discontinued long before he left the post." *Id.* at 21.

After receiving the report, Insley informed Akal that he "did not concur with Akal's findings and requested that Akal reconsider." *Id.* ¶ 13.  Insley's concern was that Akal's investigator did not adequately interview a USMS employee who was working at the Keating Building on February 24 and who "clearly saw [the Lead CSO] say he needed to write [the Plaintiff] up for this incident, after witnessing [the Plaintiff] leave in a huff." *Id.* at 25.  Akal responded with a letter stating that "[t]he USMS has not provided Akal with any information or documentation to consider that indicates [the Plaintiff] abandoned his post as alleged by the USMS" and therefore concluded that "Akal must stand by its intended action." *Id.* at 37.

Insley then sent Akal a second letter stating that the Plaintiff's actions "have undermined the District's confidence and trust in [his] ability to effectively perform his duties" and accordingly directed, acting pursuant to the USMS's authority under the USMS-Akal contract, that the Plaintiff be "permanently removed from performing under the USMS contract." *Id.* at 31.  Insley noted in his letter that "[i]f this decision is unacceptable to Akal, the disagreement shall be considered a dispute for purposes of the Contract Disputes Act." *Id.*

As the USMS-Akal contract requires, Insley provided Akal and the Plaintiff with an opportunity to respond, in writing, to Insley's decision, which the Plaintiff

6

did.  *Id.* at 34.  Insley then responded in a third letter, stating that "the USMS

***does not concur*** and the appeal of removal is . . . denied."  *Id.* at 36 (emphasis

in original).  Insley again noted that "[i]f this decision remains unacceptable to

Akal, the disagreement shall be considered a dispute for purposes of the

Contract Disputes Act."  *Id.*  This lawsuit followed.

### D.   *The Present Litigation*

The Plaintiff's complaint raises two causes of action: (1) that Insley denied

the Plaintiff due process when Insley ordered Akal to remove the Plaintiff from

CSO duty; and (2) that the USMS's order that the Plaintiff be removed from CSO

duty was an arbitrary and capricious agency decision in violation of the

Administrative Procedures Act.  Dkt. 1.  The Defendants filed a motion to dismiss

under Rule 12(b)(6), or, in the alternative, a motion for summary judgment under

Rule 56.  Dkt. No. 21.  The Plaintiff filed a response as well as a Rule 56(d)

motion requesting that consideration of the Defendants' summary judgment

motion be deferred until additional discovery could be conducted.  Dkt. Nos. 27 &

29.

Magistrate Judge Foschio, to whom this case was assigned, issued a

thorough Report and Recommendation, which recommends:  (1) granting the

Defendants' motion to dismiss the due process claim for failure to state a cause

of action under *Bivens v. Six Unknown Agents of the Federal Bureau of*

*Narcotics*; and (2) concluding that the Court lacks subject matter jurisdiction over

the Plaintiff's APA claim.  Dkt. No. 39 at 67.  Alternatively, if the Plaintiff has

stated a cause of action under *Bivens*, Magistrate Judge Foschio recommends

that the Court nonetheless dismiss the Plaintiff's first claim because Defendant

Insley is entitled to qualified immunity.  Magistrate Judge Foschio also

recommends in the alternative that if the Court finds that it has jurisdiction over

the APA claim, holding that the USMS's action was not arbitrary and capricious.

Finally, Magistrate Judge Foschio recommends denying the Plaintiff's Rule 56(d)

motion.  The Plaintiff filed objections to the R&R and responses were filed.  Oral

argument was held on June 9, 2014.

## Discussion

### A.   Claim One: Fifth Amendment Due Process

The Plaintiff's due process cause of action, if it exists, must be implied

using the framework established by *Bivens v. Six Unknown Agents of the Federal

Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny.  Working from the

premise that a right implies a remedy, *Bivens* held that courts may imply a cause

of action against federal officers for Fourth Amendment violations.  *Bivens*, 403

U.S. at 397.  *Bivens* was groundbreaking in 1971, but the trend in the intervening

forty-three years has unquestionably been in the opposite direction.  Rather than

starting from a presumption, as the *Bivens* Court did, that a deprivation of a

constitutional right necessarily implies a judicially-created remedy, in recent

years the Supreme Court has clearly indicated that implied causes of action

against federal officers are the exception, rather than the rule.  Thus, "[b]ecause

implied causes of action are disfavored, the Court has been reluctant to extend

*Bivens* liability 'to any new context or new category of defendants.'"  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S.

61, 66 (2001)).  *See also Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) ("[W]e

have . . . held that any freestanding damages remedy for a claimed constitutional

violation has to represent a judgment about the best way to implement a

constitutional guarantee; it is not an automatic entitlement no matter what other

means there may be to indicate a protected interest, and in most instances [the

Supreme Court] ha[s] found a *Bivens* remedy unjustified.").  In other words, a

plaintiff requesting a new *Bivens* cause of action is facing a difficult task.  Indeed,

since it decided *Bivens*, the Supreme Court has recognized new *Bivens* causes

of actions in only two cases.  *See Davis v. Passman*, 442 U.S. 228 (1979)

(implying cause of action under the Fifth Amendment's Due Process Clause for

congressional staffer who was terminated because of her gender); *Carlson v.*

*Green*, 446 U.S. 14 (1980) (implying cause of action under the Eighth

Amendment for deceased prisoner's estate).  By contrast, the Court has rejected

new *Bivens* actions in at least six cases.  *See Wilkie*, 551 U.S. at 551 (collecting

cases).

Nonetheless, in *Wilkie v. Robbins*, 551 U.S. 537 (2007, the Court

established a framework for *Bivens* analysis that "reflect[s] and reconcile[s] the

Court's reasoning set forth in earlier *Bivens* cases."   *Minneci v. Pollard*, 132 S.

Ct. 617, 621 (2012).  According to *Wilkie*, a court's *Bivens* analysis should

proceed in two steps.

> In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.  But even in the absence of an alternative, a *Bivens* remedy is a subject of judgment: the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.

*Wilkie*, 551 U.S. at 551 (citations and internal quotation marks omitted).

Thus, the first *Bivens* question that this Court will address is whether

Congress has provided an adequate alternative remedy for the Plaintiff's alleged

constitutional violation.  *See Davis*, 442 U.S. at 248 ("[O]f course, were Congress

to create equally effective alternative remedies, the need for damages might be

obviated.").  The Second Circuit recently answered much of this question in

*M.E.S., Inc. v. Snell*, 712 F.3d 666 (2d Cir. 2013).  In *M.E.S.*, a government

contractor brought a *Bivens* claim against members of the Army Corps of

Engineers alleging that the Corps "unfairly terminated three of [the contractor's]

construction/renovation contracts . . . . in retaliation for criticism by [the

contractor] of the Corps' mismanagement of construction projects."  *Id.* at 668.

To answer the first *Bivens* question, the Second Circuit turned to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 7101 *et seq.*

In general terms, the CDA "purports to provide final and exclusive resolution of all disputes arising from government contracts covered by the statute." *A&S Council Oil Co., Inc. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995). The CDA requires that contractors submit "[e]ach claim . . . against the Federal Government relating to a contract" to the government's contracting officer (CO). 41 U.S.C. § 7103(a)(1).  The CO must then issue a decision on the claim, *see id.*, from which the contractor may appeal to the relevant contract appeals board or the Court of Federal Claims.  *Id.* § 7104.  Appeal from either tribunal is to the Court of Appeals for the Federal Circuit.  *Id.* at § 7107(a)(1) (appeal from contract review board); 28 U.S.C. § 1295(a)(3) (appeal from the Court of Federal Claims).

In line with the Seventh and Ninth Circuits, the Second Circuit in *M.E.S.* held that "where . . . a plaintiff's constitutional claims originate in contract obligations for which the comprehensive procedural and substantive provisions of the CDA afford meaningful—and exclusive—remedies against the United States, 'we conclude it would be inappropriate for us to supplement that regulatory scheme' with new judicial remedies against United States employees pursuant to *Bivens*."  *M.E.S.*, 712 F.3d at 672 (quoting *Bush v. Lucas*, 462 U.S. 367, 368 (1983)).  *See also Evers v. Astrue*, 536 F.3d 651, 661 (7th Cir. 2008) ("Congress has provided government contractors with adequate relief for breaches of

governmental contracts under the Contract Disputes Act.  As such, a government contractor need not resort to constitutional tort suits against federal officers to vindicate his rights when he feels his contract has been unfairly terminated."); *Janicki Logging Co. v. Mateer*, 42 F.3d 561 (9th Cir. 1994).  This conclusion flows from the fact that the CDA's "remedial scheme" is "the paradigm of a precisely drawn, detailed statute," and is, therefore, exactly the sort of adequate alternative that the Supreme Court has held must preclude a *Bivens* cause of action.  *M.E.S.*, 712 F.3d at 673 (internal quotation marks omitted).  *See also Janicki Logging Co.*, 42 F.3d at 564-65 ("The CDA provides precisely the kind of mechanism that the Supreme Court and we have referred to [in *Bivens* actions]. It is a complex and substantive remedial scheme.").

This case would seem to require only a prudent extension of *M.E.S.* However, the Plaintiff argues that that extension is significant and, indeed, is dispositive.  The Plaintiff does not appear to take issue with *M.E.S.* or the proposition that the CDA is a comprehensive remedial scheme that precludes granting *Bivens* relief to federal contractors.  Rather, the Plaintiff argues that the CDA is inapplicable because the dispute in this case is not between the government and the contractor, but is instead between the government and the contractor's *employee*.  *See* Dkt. 42 at 22 ("[T]he *Bivens* analysis turns on whether the *plaintiff* has available alternate remedies not on whether someone else could pursue a claim.").  The Plaintiff therefore argues that he is left without

12

an adequate remedy to redress his constitutional claim against the Defendant.

The Plaintiff correctly notes that the language of the CDA and its accompanying

regulations suggest that the Plaintiff could not bring a CDA claim on his own

behalf. *See* 41 U.S.C. § 7103(a)(1)  (providing that each "claim by a *contractor*"

must be submitted to the contracting officer) (emphasis added); F.A.R. 2.101

(defining "claim" as a "written demand or assertion *by one of the contracting*

*parties*") (emphasis added).

However, even assuming that the Plaintiff himself could not bring a CDA

claim—and, thus, that Congress has not established an adequate remedial

scheme to redress the Plaintiff's constitutional claim—the Court will still decline to

imply a *Bivens* remedy.  The Court reaches this conclusion by considering

*Bivens*' second step, which requires "courts [to] make the kind of remedial

determination that is appropriate for a common-law tribunal, paying particular

heed . . . to any special factors counselling hesitation before authorizing a new

kind of federal litigation." *Wilkie*, 551 U.S. at 551 (citations and internal quotation

marks omitted).  To analyze *Bivens*' second step in the context of a claim brought

by a federal contractor's employee, the Court is guided by a pre-*M.E.S.* case

from the Southern District of New York, *Aryai v. Forfeiture Support Associates,*

*LLC*, 10-CV-8952 (LAP) (Aug. 27, 2012 S.D.N.Y.), which addressed a question

that is nearly identical to the one before this Court.  In *Aryai*, the plaintiff was an

employee of a company that contracted with the USMS to provide asset forfeiture

services.  Slip op. at 2.  The plaintiff alleged that he had been terminated from his position with the contractor after he raised questions about the activities of a USMS employee.  Among his claims, the plaintiff alleged that he had been terminated in violation of his First Amendment rights and, accordingly, sought to imply a *Bivens* remedy against the USMS employee.

Addressing the first step of *Bivens*, the court in *Aryai* noted, as the Court assumes here, that there was no alternative remedial scheme to redress the plaintiff's injuries.  *Aryai*, slip op. at 36.  However, turning to *Bivens*' second step, the *Aryai* court recognized that the CDA is nonetheless relevant to the *Bivens* issue.  Slip op. at 38.  *Aryai* noted, as the Second Circuit later confirmed in *M.E.S.*, that if the Plaintiff were *himself* a government contractor, then the CDA would be his sole basis for relief.  *Aryai*, slip op. at 43.  Likewise, *Aryai* noted that if the Plaintiff were an employee of the federal government—i.e., if there were not a contractor interposed between the Plaintiff and the government—then the Civil Service Reform Act (CSRA) would bar a *Bivens* claim.  *Id.* at 44.  (The Supreme Court has held that the CSRA provides a system within which federal employees' constitutional claims are "fully cognizable," even if that system does not provide complete relief for constitutional injuries.  *Bush v. Lucas*, 462 U.S. 367, 385-86 (1983).)

The Plaintiff in this case falls into the remedy-less "gap" identified by *Aryai*: neither a federal contractor nor a federal employee, the Plaintiff cannot pursue

relief using either of the statutory schemes—the CDA or the CSRA—that federal

contractors and federal employees may use to resolve their disputes with the

government.  *Aryai* thus framed the *Bivens* step-two question as follows:

"[W]hether the small subset of potential litigants that includes Plaintiff, i.e.,

employees of federal contractors, should be afforded special solicitude to invoke

*Bivens* when their employers (i.e., the contractors themselves) and federal

employees would be foreclosed from doing so."  *Aryai*, slip op. at 44.  *Aryai*

answered that question in the negative, noting "that Congress has long been

aware that employees of federal contractors are barred from suing under the

CDA and yet has failed to extend the CDA's protections to cover individuals such

as Plaintiff [which] suggests that Congress has not acted inadvertently."  *Id.*  The

*Aryai* court therefore declined to do what Congress has not done and denied

*Bivens* relief.

    *Aryai*'s conclusion comports with the Supreme Court's *Bivens* case law,

which has held that the unavailability of a statutory remedy for violations of a

constitutional right does not necessarily invite courts to fill in Congress's silence

with an implied cause of action.  Rather, courts must exhibit "appropriate judicial

deference to indications that congressional inaction has not been inadvertent.

When the design of a Government program suggests that Congress has

provided what it considers adequate remedial mechanisms for constitutional

violations that may occur in the course of its administration, we have not created

additional *Bivens* remedies." *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988). While it is unclear whether Congress has indicated that it is aware of, and acquiesces in, the absence of a remedial scheme for individuals in the Plaintiff's shoes, the Court is nonetheless hesitant to intrude on Congress's prerogative.

Before rushing to fill statutory silence with a *Bivens* remedy, the Supreme Court observed in *Wilkie* that courts should pay heed to "special factors counselling hesitation." *Wilkie*, 551 U.S. at 551 (citations and internal quotation marks omitted). That is especially true in this case, where the *Bivens* issue lies at the intersection of two detailed, highly-regulated areas of law that employ elaborate dispute resolution and appeals procedures: government contracting and federal employment. Thus, the most significant "factor counseling hesitation" is that a *Bivens* remedy in this context would create incongruities which would elevate employees of federal contractors above their peers who are directly employed by the federal government. For example, a federal employee who alleges that his or her employing agency took an adverse employment action in violation of a constitutional right might be entitled to reinstatement and backpay. *See Bush*, 462 U.S. at 388. Yet the employee is not permitted "to recover damages from a supervisor who has improperly disciplined him." *Id.* at 390. However, if the Court were to imply a *Bivens* remedy in this case, the Plaintiff likely would be entitled to claim damages. *See Navab-Safavi v. Broadcasting Bd. of Governors*, 650 F. Supp. 2d 40, 75 (D.D.C. 2009) (implying a *Bivens* cause of

action for a federal contractor in part because "the prospect of monetary damages will provide the appropriate deterrent effect, tempered by the protection that qualified immunity provides government officials against frivolous claims"). This conclusion would create a remedial scheme that is far different from what Congress has established for federal employees and federal contractors, the two types of plaintiffs most analogous to the Plaintiff in this case.  There is no reason to think that Congress would intend that two individuals who perform services for the federal government—indeed, two individuals who may perform largely the same job—should be entitled to such disparate remedies.

Rather, these disharmonious remedial schemes support the conclusion that even if Congress has not intentionally omitted employees of federal contractors from protective legislation, this Court would severely overstep its constitutional bounds to do so in Congress' stead.  The Court is unwilling to partially supplant two "elaborate remedial system[s]"—the CDA and the CSRA— "that ha[ve] been constructed step by step, with careful attention to conflicting policy considerations."  *Bush*, 462 U.S. at 388.  *See also Pollock v. Ridge*, 310 F. Supp. 2d 519, 530 (W.D.N.Y. 2004) (on similar facts, noting that "[t]o allow a *Bivens* claim in these instances would, in effect, allow a dissatisfied federal employee to bypass the applicable . . . statutory schemes and pursue a judicially created private remedy in a court of law, thereby ignoring Congressional intent altogether").

Further, there are two other "special factors counselling hesitation" in this case that contribute to the Court's decision not to imply a *Bivens* cause of action. First, the Plaintiff has pointed to no reason why Akal could not bring a CDA claim on his behalf.  Indeed, the USMS's Contracting Officer noted in his two letters to Akal that if Akal disagreed with the Contracting Officer's decision, then the appropriate remedy would be a claim under the CDA.  *See* Dkt. No. 23 at 31, 36. The Court is mindful that this option may not provide adequate relief for the Plaintiff.  However, inadequate substitutes do not automatically imply a right to pursue a cause of action under *Bivens.*

Second, the USMS is authorized to, among other things, "provide for the personal protection of Federal jurists, court officers, witnesses, and other threatened persons in the interests of justice."  28 U.S.C. § 566(e)(1)(A).  Thus, as Magistrate Judge Foschio noted, "it is necessary that the USMS have broad discretion in the selection of CSOs, as contractor employees, to serve as reliable security personnel capable of assisting the USMS in carrying out this heavy responsibility."  Dkt. No. 39 at 21.  While it may not be that the USMS should have limitless discretion in *all* of its personnel decisions, neither does it suggest that the Court should second guess the USMS's security-related assessments of employee suitability.  Given the serious security concerns that underlie the USMS's decision in this or similar cases, if the USMS's discretion should be

18

tempered, it should be Congress, and not this Court, that makes that determination.

In an effort to defeat the conclusion that the Court should not imply a *Bivens* cause of action in this case, the Plaintiff points to the decision by the District Court for the District of Columbia in *Navab-Safavi v. Broadcasting Board of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009).  In *Navab-Safavi*, the plaintiff was a contractor who provided translation services for the Broadcasting Board of Governors, a federal agency responsible for "overseeing all U.S. government and government-sponsored non-military international broadcasting services."  *Id.* at 46.  The Plaintiff sought a *Bivens* remedy after she claimed that her contract was terminated in retaliation for her participation in a music video that protested the United States' military activities in Iraq.  *Id.*  The *Navab-Safavi* court first analyzed the CDA and the Administrative Procedures Act and concluded that neither statutory scheme provided an adequate remedy for the plaintiff's First Amendment claim.  However, turning to *Bivens*' second step, the court concluded that the plaintiff's potential First Amendment claim was "judicially manageable," because there were no "difficult questions of valuation or causation."  *Id.* at 75-76.  The court further concluded that the defendants' other concerns—a "disrupt[ion]" of "federal agencies' ability to manage contracts featuring at-will termination rights" and the potential for an onslaught of follow-on litigation—were

unfounded.  *Id.*  The court therefore implied a *Bivens* cause of action for the plaintiff's First Amendment claim.  *Id.*

This Court respectfully disagrees with *Navab-Safavi*.  Unlike the Plaintiff in this case, the plaintiff in *Navab-Safavi* appears to have directly contracted with the federal government.  Thus, the *Navab-Safavi* plaintiff would ordinarily be required to raise her claim under the CDA.  Nonetheless, the court in *Navab-Safavi* concluded that in light of the injunctive and declaratory relief sought by the plaintiff, as well as her request for damages that "cannot be ascertained by reference to her contract," the plaintiff's First Amendment claim was "not the type of 'claim' governed by the CDA."  *Id.* at 69 (quoting F.A.R. § 2.101).  However, the court's conclusion in *Navab-Safavi* would permit government contractors to plead around the CDA by requesting equitable relief, thereby avoiding the CDA's limited remedies and exclusive grant of jurisdiction in the Court of Federal Claims or the contract appeals boards.  *See* Wright & Miller, Fed. Prac. & Proc. § 4101 (noting that the Court of Federal Claims generally may not grant equitable relief). In cases like this, contractors or employees of contractors would almost certainly like greater relief than the Court of Federal Claims or the contract appeals boards are able to provide.  However, *Bivens* is concerned with *adequate*—not perfect— alternative remedial schemes.

Moreover, because it involves an individual who has directly contracted with the federal government—rather than an employee of a federal contractor—

*Naveb-Safavi*'s holding is contrary to the Second Circuit's holding in *M.E.S.*

Thus, this Court declines to follow *Naveb-Safavi* and instead agrees with the two

cases in this Circuit that have concluded that individuals in the same position as

the Plaintiff cannot obtain *Bivens* relief.  *See Aryai v. Forfeiture Support Ass'c,*

*LLC*, 10-CV-8952 (LAP) (S.D.N.Y. Aug. 27, 2012); *Pollock v. Ridge*, 310 F. Supp.

2d 519 (W.D.N.Y. 2004).

The Court recognizes that its conclusion in this case means that the

Plaintiff is likely left without a remedy for the constitutional violation he allegedly

suffered.  However, the Supreme Court has repeatedly stated that the absence

of a remedy is not an automatic invitation for courts to imply one under *Bivens*.

While this may mean that constitutional rights might go unredressed, as the court

aptly noted in *Aryai*, "[t]hat a particular plaintiff might suffer 'unredressed' injuries

were a court not to recognize a new type of *Bivens* action may be a hard truth but

it is a truth nonetheless and one to which the Supreme Court has alerted

potential litigations."  *Aryai*, slip op. at 42.

Thus, the Plaintiff's first cause of action fails to state a claim upon which

relief may be granted and is dismissed.

### B.    Claim Two: The Administrative Procedures Act

The Plaintiff's second claim is that the USMS violated the Administrative

Procedures Act (APA) when it ordered Akal to remove the Plaintiff from CSO

duty. The Plaintiff asks the Court to review the USMS's decision pursuant to the APA's judicial review provisions. *See* 5 U.S.C. § 706(2).

After the Defendants filed their motion to dismiss and the Plaintiff filed his response, Magistrate Judge Foschio requested that the parties provide additional briefing on the question of whether the USMS's decision was subject to APA review. *See* Dkt. No. 34. With the benefit of that additional briefing, Magistrate Judge Foschio concluded that the Court does not have subject matter jurisdiction over the Plaintiff's APA claim. For the reasons stated below, the Court agrees with Magistrate Judge Foschio's conclusion.

The issue here lies at the intersection of the APA and the Tucker Act, both of which waive the federal government's sovereign immunity for certain types of claims. Section 702 of the APA "permits a party to bring an equitable claim challenging arbitrary and capricious action of an administrative agency in federal district court and waives the government's sovereign immunity with respect to such claims in that forum." *Up State Fed. Credit Union v. Walker*, 198 F.3d 372 374 (2d Cir. 1999). However, § 702 also contains a provisio: "Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* In this case, the Tucker Act "operates as such a limitation of section 702 in cases based on contracts with the federal government." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 893 (D.C. Cir. 1985).

The Tucker Act serves two functions.  First, the Tucker Act waives the federal government's sovereign immunity with respect to "any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  Second, the Tucker Act vests the United States Court of Federal Claims with jurisdiction over claims that fall within the Tucker Act's waiver of sovereign immunity.  *Id.  See United States v. Mitchell*, 463 US. 206, 212 (1983) (recognizing that "by giving the Court of [Federal] Claims jurisdiction over specified types of claims against the United States, the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims").  The Court of Federal Claims' jurisdiction over Tucker Act claims is exclusive except with respect to claims "not exceeding $10,000."  28 U.S.C. § 1346(a)(2).  Such "Little Tucker Act" claims fall within the concurrent jurisdiction of the United States District Courts and the Court of Federal Claims.  *See* § 1346(a).[1]

Thus, the question in this case is whether the Plaintiff's second cause of action, which he styles as a claim for APA review, is really a contract dispute.  If it is a contract dispute, then the Tucker Act gives jurisdiction only to the Court of Federal Claims.[2]  If, on the other hand, the Plaintiff's claim is not really a contract

---

[1] The Tucker Act also provides that the Court of Federal Claims "shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under" the Contract Disputes Act.  28 U.S.C. § 1491(a)(2).  This provision of the Tucker Act is not at issue in this case because, as was noted in the previous section, the Plaintiff cannot bring a CDA claim.

[2] The Plaintiff does not request a particular amount of damages.  Instead, he seeks an order "to make [the Plaintiff] whole, including by compensating [him] for his lost wages, loss of employment opportunities, mental anguish, and emotional distress."  Dkt. No. 1 at 15.  However, the Court may infer, based on the pleadings in the case and the Plaintiff's requested relief, that

dispute, then this Court may review the USMS's decision under the APA,

exercising jurisdiction pursuant to the general federal question jurisdiction

statute, 28 U.S.C. § 1331.  *See Spectrum Leasing Corp.*, 764 F.2d at 893

("[R]esolution of this dispute turns upon whether [the plaintiff's] claim is a contract

dispute subject to the jurisdiction of the Claims Court under the Tucker Act, or a

request for review of agency action under the APA and section 1331.")  The

relevant inquiry is whether the Plaintiff's claim actually arises under the Tucker

Act, that is, whether it is a claim "founded . . . upon any express or implied

contract with the United States."  28 U.S.C. § 1491(a)(1).

In *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), and a

subsequent line of cases, the D.C. Circuit developed what the Second Circuit has

referred to as a "useful analysis for distinguishing contract claims from

challenges to agency action."  *Up State Fed. Credit Union*, 198 F.3d at 375.  *See*

*also id.* at 376 (noting that "the two-pronged formulation of *Megapulse* . . . builds

logically on the analysis this Circuit has developed to assess jurisdiction in the

related context of the government contracts process").  According to *Megapulse*,

to determine whether a plaintiff is actually pleading a contract claim

masquerading as an APA claim, courts should examine "both . . . the source of

the rights upon which the plaintiff bases its claim, and upon the type of relief

sought."  *Megapulse*, 672 F.2d at 968.  The D.C. Circuit's "rights and remedies"

_____

his claim is for well over $10,000.  *See Powell v. Castaneda*, 390 F. Supp. 2d 1, 7 (D.D.C. 2005)
(collecting cases inferring a damages request for more than $10,000 in employment-related
actions).

approach looks to whether "the claim so clearly presents a disguised contract action that jurisdiction over the matter is properly limited to the Court of [Federal] Claims." *Id.*

Thus, the Court must first look at the "source of the rights upon which the plaintiff bases [his] claim." *Id.* It is clear that the USMS was able to take the action it did—order that Akal remove the Plaintiff from CSO duty—*only* because the contract authorized the USMS to do so; absent the contract, the USMS could do nothing to effect the Plaintiff's employment with Akal. This case is therefore similar to *Kielczynski v. Central Intelligence Agency*, 128 F. Supp. 2d 151 (E.D.N.Y. 2001). In *Kielczynski*, the plaintiff alleged that he had entered into a secret contract with the CIA pursuant to which the plaintiff "was to convey classified information to the CIA concerning Israel in exchange for a monthly salary of approximately $3,000 per month, as well as reimbursement of costs and expenses." *Id.* at 153. The plaintiff then alleged that after several years of providing intelligence, the CIA "fraudulently terminated its contract with him." *Id.* (internal quotation marks and modifications omitted). The plaintiff sued, claiming among other things that the CIA's alleged termination of the secret contract violated the plaintiff's due process rights. *Id.* at 154.

The court in *Kielczynski* held that it lacked subject matter jurisdiction over the plaintiff's claim. According to *Kielczynski*, the plaintiff's claim was ultimately contractual in nature, because "like the plaintiff in *Up State* [*Fed. Credit Union v.*

*Walker*, 198 F.3d 372 374 (2d Cir. 1999)] and unlike the plaintiff in *Megapulse*, plaintiff's rights *would not have existed in the absence of a contract*.  Had the parties never entered into the alleged contract in this case, [the plaintiff] would have no possible right to seek a hearing adjudicating the rights to compensation and protection from the harm purportedly created by that contract.  Therefore, the rights he seeks to enforce through this action are not ultimately based on anything other than the alleged contract with the CIA."  *Id.* at 160 (internal quotation marks omitted) (emphasis added).  So too in this case, the Plaintiff has no rights but for Akal's contract with the USMS.  This is therefore a case like *Up State Federal Credit Union*, where, "in the absence of a contract with the [government], . . . it is likely that no cause of action would exist at all."  *Up State Fed. Credit Union*, 198 F.3d at 377 (internal quotation marks omitted).

The judicial review provisions of the APA, upon which the Plaintiff bases his second claim, do not provide the Plaintiff with any independent source of rights and do not alter the Court's conclusion that the source of rights in this case is contractual.  The APA does provide individuals with rights vis-à-vis actions that Congress has authorized an agency to take, but the APA is not itself a free-standing source of rights.  It is instead—as its name implies—a source of procedural restraints on agency action.  Unless Congress has authorized an agency to take a certain action, the APA has nothing to act against.  Likewise, in this case, the APA may constrain how the USMS exercises its authority under

the contract, but the APA is not the source of the authority that the USMS

exercises.  It is the latter issue—the source of authority, and not constraints on

that authority—that *Megapulse* and its progeny are concerned with.

　　For example, in *Spectrum Leasing Corp. v. United States*, 764 F.2d 891

(D.C. Cir. 1985), the General Services Administration (GSA) invoked a contract's

liquidated damages clause and withheld payment after a government contractor

failed to comply with certain of the contract's terms.  *Id.* at 892.  The contractor

sued in district court, alleging that "by withholding payments . . . GSA violated the

procedures set forth in" the Debt Collection Act (DCA), an act which "provides a

set of procedures and safeguards designed to assure due process protections to

delinquent government debtors and to ensure the ability of the federal

government to collect its debts."  *Id.* at 892 & n.1.  However, applying *Megapulse*,

the D.C. Circuit held that the DCA only shaped the contours of GSA's pre-

existing contractual authority.  "The right to these payments [from GSA to the

contractor] is created in the first instance by the contract, not by the Debt

Collection Act.  The DCA . . . confers no such right in the absence of the contract

itself.  Although the DCA might impose procedural requirements on the

government having some impact on the contract, the Act in no way creates the

substantive right to the remedy [the contractor] seeks."  *Id.* at 894.  The Court

finds *Spectrum Leasing*'s reasoning to be persuasive and, for the reasons stated

above, concludes that the Plaintiff's source of rights in this case is contractual.

To determine whether a Plaintiff has pleaded a disguised contract claim over which the Court lacks subject matter jurisdiction, *Megapulse* next requires that the Court look at the "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968. Certain types of remedies, such as equitable relief, are generally beyond the Court of Federal Claims' jurisdiction. *See Richardson v. Morris*, 409 U.S. 464, 465-66 (1973). By contrast, the Tucker Act *does* authorize the Court of Federal Claims to award monetary damages. Thus, for purposes of Tucker Act jurisdiction, claims seeking monetary damages are generally considered "contractual." *See id.* ("[T]he Tucker Act has long been construed as authorizing only actions for money judgments and not suits for equitable relief against the United States. The reason for the distinction flows from the fact that the Court of Claims has no power to grant equitable relief . . . .") (citations omitted). In his complaint, the Plaintiff seeks declaratory relief, an order that the USMS reinstate the Plaintiff to his position, and an order "to make [the Plaintiff] whole, including by compensating [him] for his lost wages, loss of employment opportunities, mental anguish, and emotional distress." Dkt. No. 1 at 15. Thus, the Plaintiff primarily seeks a classic contractual remedy: damages that will place him in roughly the same position that he would have been in had the contract been properly performed. *See Kinzley v. United States*, 288 Ct. Cl. 620, 629-30 (Ct. Cl. 1981) (in a claim alleging breach of an employment contract with a federal agency, noting that "[t]he damages the plaintiff may recover for breach of contract . . . will provide proper compensation under the rule that a party injured

by the breach of a contract is entitled to be placed in the position (it) would have been had the promised performance been carried out") (internal quotation marks omitted).  Although it is true that the Plaintiff also seeks non-monetary relief, such as reinstatement and a declaratory judgment, this case is, at its heart, an employment dispute for which the classic—"or appropriate," *Megapulse*, 672 F.2d at 968—relief is monetary damages.  To the extent that the type of relief sought is a close question, the Court holds that the source of rights at issue in this case—i.e., the first *Megapulse* question—is related to and derives from the USMS-Akal contract and therefore tips the jurisdictional issue in favor of Tucker Act jurisdiction.

Thus, the Court concludes that the Plaintiff's second claim, alleging that the USMS exercised its contractual authority in violation of the APA, is actually a claim that sounds in contract and therefore falls within the scope of the Tucker Act.  To be sure, this case presents a distinction that seems to be absent from similar cases in which district courts have refused to exercise jurisdiction over disguised Tucker Act claims; unlike in other cases, the Plaintiff here did not directly contract with the government.  However, on balance, the Court concludes that, for jurisdictional purposes, the Plaintiff's second claim in this case is more contractual than not.  *See Indian Wells Valley Metal Trades Council v. United States*, 553 F. Supp. 397, 399 n.5 (Cl. Ct. 1982) ("'[R]ational distinctions between actions sounding genuinely in contract and those based on truly independent

legal grounds,' remain within the court's power to draw.") (quoting *Megapulse*, 672 F.2d at 969) (citation omitted)).   At least one other court has reached the same conclusion on similar facts.  In *Pollock v. Ridge*, 310 F. Supp. 2d 519, 528-29 (W.D.N.Y. 2004), the plaintiff was a former employee of a government contractor that provided administrative services for the Immigration and Naturalization Service's Buffalo Detention Center.  *Id.* at 524.  After her employment was terminated, the plaintiff brought claims alleging that she was terminated without due process.  *Id.*  The *Pollock* court concluded, as the Court does in this case, that the plaintiff's claims were "based in contract" and were therefore within the Court of Federal Claims' exclusive jurisdiction.  *Id.* at 528.

Although this case presents a close question, the Court concludes that Congress's expressed preference for "provid[ing] a single, uniquely qualified forum for the resolution of contractual disputes"—i.e., the Court of Federal Claims—favors a finding that this Court lacks subject matter jurisdiction over the second claim.  *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).  The Plaintiff's second claim ultimately asks this Court to review the adequacy of the procedures the USMS used to determine that the Plaintiff should be removed from the USMS-Akal contract.  Although questions of procedural adequacy under, for example, the Due Process Clause are eminently familiar to the federal district courts, this case presents the issue in a context—government contracting—that Congress has placed almost exclusively within the expertise of

the Court of Federal Claims.  *See* Wright & Miller Fed. Prac. & Proc. § 4101 ("Certainly, any dispute involving the validity, interpretation, or administration of a contract should be heard in the Claims Court.").  Consequently, this Court lacks subject matter jurisdiction over the Plaintiff's second claim.

## Conclusion

For the reasons stated above, the Court adopts Magistrate Judge Foschio's recommendation that the Defendants' motion to dismiss be granted. Because the Court grants the Defendants' motion to dismiss, the Plaintiff's Rule 56(d) motion is moot.  Accordingly,

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss, Dkt. No. 20, is GRANTED in its entirety;

FURTHER ORDERED that the Plaintiff's complaint is DISMISSED; and

FURTHER ORDERED that Plaintiff's Rule 56(d) motion to defer consideration, Dkt. No. 27, is DENIED.

**SO ORDERED.**

S/ Richard J. Arcara
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: July 10, 2014
Buffalo, New York